IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

vs.                                                                                                                    Crim. No.  20-2059 JCH

**LIONEL VALLO,**

        **Defendant.**

## MEMORANDUM OPINION AND ORDER

Defendant Lionel Vallo filed a *Motion to Suppress Evidence* (ECF No. 35) on October 14, 2021. Defendant seeks to suppress the firearm and statements he made to Albuquerque Police Department ("APD") officers that he argues were the product of an unconstitutional seizure unsupported by reasonable suspicion. The Government opposes the motion, asserting that the detaining officers had reasonable suspicion to justify his detention. This Court held an evidentiary hearing on the motion on May 10, 2022. Having considered the motion, briefs, evidence, arguments, applicable law, and otherwise being fully advised, the Court will grant the motion to suppress.

**I.      FACTUAL BACKGROUND**

ShotSpotter is an acoustic gunshot detection and location system, which operates by installing a series of sensors in an area to listen for the sound of gunfire, a type of impulsive noise. (May 10, 2022, Hr' Tr. (hereinafter "Hr'g Tr.") 34:5-11.) The system detects shots that are fired from outside a building, as enough sound typically cannot reach the sensors from a shot fired from inside an enclosed area. (*Id.* at 44:18-45:8.) When its sensors detect an impulsive noise, the system

will timestamp the exact time and report it back to a central server software. (*Id.* at 34:12-15.) Using a multilateration mathematical technique, the software calculates the geographic location of where the impulsive noise originated. (*Id.* at 34:15-21.) The system then records its confidence as to whether it believes the sound to be gunfire, and the information is sent to an incident reviewer who is trained to listen to the sound and make a final opinion on whether it is gunfire and how many rounds were fired. (*See id.* at 34:22-35:6, 40:7-10, 66:19-67:12.) At that point, the incident is transmitted directly to the law enforcement agency, with the entire process taking approximately 45-60 seconds. (*Id.* at 35:7-11.)

ShotSpotter calculates the point of latitude and longitude where the gun was fired, so officers receive a report with a map that shows a dot indicating where the shot was fired and a circle around it that gives a general area of where the shot occurred. (*See id.* 6:6-11, 22:8-17, 35:18-24.) The radius of the circle is 25 meters. (*Id.* at 6:12-14, 43:24-25.) ShotSpotter uses a geocoder selected by the customer to translate the latitude and longitude into a street address. (*Id.* at 53:10-25.) The report is displayed on an application on the officers' computers. (*See id.* at 40:16-41:14, 72:11-18.)

On August 1, 2020, at 1:53 a.m., APD officers Eduardo Munoz and Hugo Garcia were dispatched to 420 Vermont Street in Albuquerque based on a ShotSpotter activation report stating that someone had discharged a firearm in the area of that address. (*See* Hr'g Tr. 5:8-7:2, 9:17-19.) The ShotSpotter alert occurred at 1:51 a.m. (*Id.* at 46:19-25.) The area within the circle of the alert had approximately four buildings. (*Id.* at 77:7-12.) Because the location was an area where a person would be prohibited from shooting a firearm due to the potential harm to others in the residential area, officers were investigating the crime of negligent use of a firearm. (*See id.* at 10:1-8, 89:21-90:6.) Officer Garcia had been involved with investigations based on ShotSpotter several dozens

2

of times, and believed, based on his experience, that it was reliable, although he admitted that he had responded to such alerts where he did not find anything. (*See id.* at 18:12-21, 71:23-72:8.) Officer Munoz also stated the SpotSpotter technology was pretty accurate based on his own experience, although he too acknowledged there are times when responding to a ShotSpotter alert that he did not find anyone or find anything related to the alert. (*See id.* at 108:5-15.) Neither officer understood how the underlying technology works. (*Id.* at 74:4-16, 108:16-22.)

Officers Munoz and Garcia arrived on scene about 2:00 a.m. (Hr'g Tr. 7:3-5.) The officers used the satellite image and reference points, such as the buildings and streets, to determine where the ShotSpotter-identified area was. (*See id.* at 22:15-23:8.) They began walking towards 420 Vermont and approached a man sitting in a parked car just outside the circular area indicated on the ShotSpotter report. (*Id.* at 7:8-16.) Officer Munoz asked the man if he heard any gunshots, and he said he had not. (*Id.* at 7:8-16, 88:2-3) They then asked him how long he had been sitting there, and he responded that he had been there for two minutes, but he had a radio on. (*See id.* at 7:17-24, 88:2-10; Lapel Video B at 0:35-1:06.)

The officers continued walking toward where the ShotSpotter activation came. (Hr'g Tr. 88:24-25.) They entered the 420 Vermont Street parking lot, which is used by a small apartment complex and is in a high-crime area. (Hr'g Tr. 7:25-9:6, 92:18-21.) The lot was dark. (*Id.* at 9:5-8, 92:16-17.) The officers saw a man, later identified as Lionel Vallo, leaning against a parked vehicle and talking to the person inside. (*See* Lapel Video B at 1:32-1:38; Hr'g Tr. 10:11-13, 89:3-4.) Vallo was standing within the area of the 25-meter circle in the ShotSpotter report. (Hr'g Tr. 10:18-20, 89:3-4.) Officer Garcia drew his firearm. (*Id.* at 77:24-78:1.). For officer safety, the officers announced themselves as police and instructed Vallo to raise his hands and come back

3

towards them. (*See* Lapel Video B at 1:35-42; Hr'g Tr. 10:21-24, 77:13-78:15, 83:20-84:24.) Vallo complied with their commands. (Lapel Video B at 1:37-2:03; Hr'g Tr. 78:7-15, 89:6-11.)

Because of the nature of the shot-fired call, it was late at night, and Vallo was in the 25-meter area where the round was fired, Officer Munoz patted down Vallo to search for weapons. (*See* Lapel Video B at 2:03-2:13; Hr'g Tr. 11:1-8, 89:12-20.) He found a loaded firearm inside Vallo's waistband. (Hr'g Tr. 89:7-8.) Officer Munoz took the firearm and placed Vallo in handcuffs while he conducted his investigation. (*Id.* at 90:13-16.) Officer Munoz told him he was being detained and ordered him to sit on the curb, which he did. (*Id.* at 90:17-91:3.) They then ordered the man in the car, who was later identified as Anthony Martin, to exit with his hands up and walk backwards towards them. (*See id.* at 11:3-5, 14:1-8, 91:22-92:13; Lapel Video B at 2:50-5:01.) They patted him down as well and had him sit on the sidewalk. (Hr'g Tr. 11:3-18, 91:22-92:6.) The officers informed them that they were being detained because the officers were investigating shots fired that came from exactly where they were standing. (*See* Hr'g Tr. 12:15-18, 92:9-13.)

While Officer Munoz went to get his vehicle, Officer Garcia waited with the handcuffed suspects. (Hr'g Tr. 11:20-22, 12:10-12, 105:19-25.) Officer Garcia spoke with the men, asking for their names and listening to what they had to say. (*Id.* at 12:4-9.) When Officer Munoz returned, Officer Garcia went to the area in the general vicinity of the 25 meters to look for a casing. (*Id.* at 14:15-24.)

Officer Munoz began questioning Vallo while he was in handcuffs on the curb, asking questions about his identity, where his record was from for his prior conviction, the gun, and where the shots were fired. (*See* Hr'g Tr. 106:1-107:17.) At that point, neither officer had Mirandized him. (*See id.* at 106:24-107:3.) He told Vallo that they had been called out for shots fired, they

knew exactly where it happened, and if he just admitted that, then he could go on his way. (Hr'g Tr. 106:15-20.)

Officer Garcia found a spent casing about five yards from where Vallo was standing when the officers first saw him. (*See* Hr'g Tr. 14:19-15:20.) The casing itself was within the parameters of the circle identified by ShotSpotter. (*Id.* at 15:24-16:2.) After officers placed Vallo in the back of the patrol car, he asked to speak with them. (*See* Gov.'s Ex. 3 at 0:30-1:17.) An officer read him his *Miranda* rights, and Vallo confessed to firing a single round in the air and to having a felony conviction. (*See id.* at 0:30-2:55, 4:00-4:25.) Vallo was subsequently indicted in federal court on the current charge of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and § 924.

## II.   ANALYSIS

The Government does not contest that Vallo was seized when he obeyed the officers' commands and they placed handcuffs on him. Instead, the Government argues that officers had reasonable, articulable suspicion that Vallo was armed and dangerous at that time because he was standing within the area of the ShotSpotter alert late at night in a high crime area.

To determine whether an investigative detention is reasonable, the court must determine (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances that justified the stop in the first place. *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995). An investigative detention is justified when the officer is aware of specific, objective, articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the detained individual may be engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 20-21 (1968); *United States v. Lambert*, 46 F.3d 1064, 1069 (10th Cir. 1995). "For reasonable suspicion to exist, an officer 'need not rule out the

possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (quoting *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004)). "Evidence falling 'considerably short' of a preponderance satisfies this standard." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). A court considers the totality of the circumstances and the information available to the officer when determining whether reasonable suspicion existed. *See id.* The government bears the burden of proving the detention was reasonable. *United States v. Vance*, 893 F.3d 763, 773 (10th Cir. 2018).

"If the officer has such reasonable and articulable suspicion, she may also conduct a protective frisk of the suspect's outer clothing if she reasonably believes that the suspect might be armed and presently dangerous." *United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir. 2002). Police officers are not required to take unnecessary risks in performing their duties and may take steps reasonably necessary to protect their personal safety and maintain the status quo during an investigative detention. *United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir. 1996). The display of firearms does not automatically transform a *Terry* stop into an arrest where the officers reasonably believe the weapons are necessary for their protection. *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993). Here, the officers were investigating the negligent use of a firearm, and thus, had reason to be concerned for their safety when approaching a suspect for that crime. Consequently, the display of firearms would not have transformed the investigative detention into an arrest, so long as, at the time they displayed their firearms, the officers had an objectively reasonable suspicion to believe that Defendant was the suspect who had discharged the firearm.

Factors to consider may include the close spatial and temporal proximity between the reported crime and seizure, the number of people about in the area, multiple other stops, a report

of criminal activity or gunshots, viewing of an object or bulge indicating a weapon, the time of day, flight, the high crime nature of the location, furtive hand movements, an informant's tip, and a person's reaction to questioning, among others. *See Armstrong v. United States*, 164 A.3d 102, 110 (D.C. 2017). *See also United States v. Guardado*, 699 F.3d 1220, 1223 (10th Cir. 2012) (in analyzing reasonable suspicion, considering factors such as area's disposition toward criminal activity, the time of night, and suspect's behavior, particularly flight). "With regards to temporal proximity, particularized reasonable suspicion is usually found when the passage of time between the occurrence of a crime and a subsequent stop is immediate or within only a few minutes; a longer passage of time, however, does not negate particularized suspicion as long as other factors are present." *Armstrong*, 164 A.3d at 110.

In this case, approximately ten minutes elapsed from when ShotSpotter detected the impulsive sound and when officers saw Vallo standing in the 25-meter area identified in the ShotSpotter report as the area in which the shot was fired. Vallo and his cousin were the only persons within the 25-meter area. It was late at night in a high crime area. The Government argues that, based on these facts, the officers had reasonable suspicion to believe that Vallo had discharged the firearm and were justified in seizing him with their firearms drawn and patting him down before asking him questions.

The Tenth Circuit has yet to rule on the issue of reasonable suspicion in a case involving ShotSpotter. Accordingly, the parties cited some out-of-circuit cases for this court's consideration. In *United States v. Rickmon*, an officer responded to the scene indicated by a ShotSpotter alert and stopped the only car the officer observed on the street on which dispatch said the cars were observed driving. *See Rickmon*, 952 F.3d 876, 879-80 (7th Cir. 2020). At the hearing, the officer admitted there was nothing unusual about the car other than it was leaving the area of the gunfire.

*Id.* at 880. The Seventh Circuit affirmed the district court's denial of the defendant's motion to suppress. While agreeing generally that "ShotSpotter, standing on its own, should not allow police officers to stop a vehicle in the immediate vicinity of a gunfire report without any individualized suspicion of that vehicle," the Seventh Circuit concluded there were enough other facts beyond just the location of the car in ShotSpotter's coverage zone. *Id.* at 881. The *Rickmon* court found the following additional facts enough to amount to reasonable suspicion to stop the car: the officer received information on two ShotSpotter alerts *and* two 911 calls reporting a shooting; the callers said that cars were leaving the scene and a person running away from the shooting; the officer encountered the defendant's vehicle on the same block of the shooting five-and-a-half minutes after he received reports of shots fired; the officer saw the vehicle driving away from the site of the shooting on the only street leading from it; and there was no other traffic on the road at 4:45 a.m. *See id.* at 882-85.

  Like *Rickmon*, here officers found Vallo at the location identified by the ShotSpotter report. Other facts, however, distinguish *Rickmon* from this case. Unlike in *Rickmon*, there were no additional dispatch calls corroborating the ShotSpotter information. Moreover, the difference in time was about eight minutes, rather than five minutes, from the time the officers received a shot-fired report and when officers first encountered Vallo.[1] Here, officers observed another person at the scene in his car and near the ShotSpotter-identified area. Moreover, Vallo was talking to his brother inside the vehicle, a situation that could also indicate that they were witnesses, rather than suspects. The officers acknowledged at the hearing that Vallo had not otherwise acted suspiciously before they detained him.

---

[1] *Rickmon* only discussed the timing of when the officer received the ShotSpotter report, not when ShotSpotter detected the gunshot sound. Here, we know about ten minutes elapsed from the detection of the shot and when officers first saw Vallo.

In another ShotSpotter case, the D.C. Circuit affirmed the district court's denial of the defendant's motion to suppress after concluding that the officers had reasonable suspicion to stop the defendant. *See United States v. Jones*, 1 F.4th 50, 51-53 (D.C. Cir. 2021). Arriving on the block identified by ShotSpotter as the location of the sound of gunshots within a minute and a half of receiving the alert, officers observed the defendant walking quickly and saw no one else outside on the block. *Id.* Dispatch reported calls by citizens confirming shots fired on that block. *Id.* Officers decided to stop the defendant, calling out to him. *Id.* at 51-52. Defendant stopped ten seconds later, removed his headphones, but his hand kept moving, gravitating towards his waistband area. *Id.* at 52. An officer grabbed the suspect's hand, told him to stop moving, and the other two officers then converged on him. *Id.* An officer tackled the defendant after observing an item jostle in Jones's waistband, and after a struggle, recovered a pistol. *Id.* The *Jones* court noted, "When presence where a crime is reported to have occurred is coupled with evasive behavior, we have found reasonable suspicion even when more time has elapsed." *Id.* at 54.

*Jones* provides some support to the Government because the officers saw Vallo in the ShotSpotter-identified parking lot. But again, there is a difference in time of approximately ten minutes from the ShotSpotter detection of the potential gunshot and officers observing Vallo at the location. Moreover, in *Jones* and *Rickmon*, the suspect or suspected vehicle were the only person or car observed in the location of the alert. In contrast, officers here first approached a different individual in a car near the scene who reported that he had not heard shots fired. Moreover, unlike in *Jones*, Vallo was not quickly leaving the scene. Instead, he was talking to someone in a car and not behaving in any way suspiciously. While ten minutes in certain cases might be close enough temporally to add to reasonable suspicion, the more time that passes lessens the chance that an officer will encounter the suspect of a crime, who has an incentive to leave the

scene quickly. The passage of ten minutes, when considered with the lack of suspicious behavior by Vallo or his companion and the lack of corroborative evidence of a gunshot, reduces the weight to give to the fact that officers observed Vallo within the ShotSpotter area.

The problem for the Government is that the only fact the officers had to suspect Vallo had committed the crime of discharging a firearm within city limits is that he was within the circular area identified by ShotSpotter as the area of probable discharge. The Seventh Circuit has questioned whether a single ShotSpotter alert alone is sufficient to amount to reasonable suspicion. *See Rickmon*, 952 F.3d at 881. While reasonable suspicion is not an exacting standard, the officers in this case did not have any other reason to suspect Vallo of the crime other than his location at the time they seized him. They had no objective visual clues of behavior by Vallo that was suspicious, such as nervousness, furtive movements, or evasion. Nor was Vallo attempting to leave the scene. Although the Court remains sensitive to the need for officer safety when investigating a scene in a high crime area at night involving the suspected use of a firearm, the officers did not have enough here to indicate Vallo was involved other than his proximity to the potential criminal activity, and that was diluted by the passage of time of ten minutes, the lack of other corroborative evidence of gunshots, and the lack of suspicious behavior by Vallo. *Cf. United States v. Delaney*, 955 F.3d 1077, 1085-86 (D.C. Cir. 2020) ("To be sure, Delaney's proximity to 'close-by gunshots,' … , goes some way toward establishing reasonable suspicion. But the Supreme Court made clear in *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), that '[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.'"); *United States v. Carter*, Crim. No. 20-05 (JDB), 2020 WL 3893023, *5-7 (D.D.C. July 10, 2020) (granting motion to suppress and rejecting government's argument that officers had reasonable suspicion based only

on gunshots identified in the area just a minute before via the ShotSpotter system, that neighborhood was a high-crime area, and defendant and his companions were the only people in area late at night).

Cases involving anonymous tipsters are analogous. *See Rickmon*, 952 F.3d at 882. The Tenth Circuit has explained that if a tip has a low degree of reliability, more information or corroboration will be necessary to meet the reasonable suspicion standard than would be required if the tip were more reliable. *United States v. Johnson*, 364 F.3d 1185, 1191 (10th Cir. 2004) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). "[C]orroborating observation by the police helps ensure that police do not use vague tips to violate the Fourth Amendment rights of innocent citizens." *Id.* This Court therefore believes that the Tenth Circuit, like the Seventh Circuit, will require some additional information beyond a single ShotSpotter alert to amount to reasonable suspicion.

Even assuming that the ShotSpotter notification is reliable, as the officers testified based on their experience, the facts here lack any other corroboration or information to support the reliability of the tip that a gunshot occurred at that location, such as nervousness or evasive behavior by Vallo or confirmation by a witness of gunshots. Consequently, the Court will grant Defendant's motion to suppress and suppress both the gun and his statements that followed as fruit of the unlawful detention.

**IT IS THEREFORE ORDERED** that Defendant's *Motion to Suppress Evidence* (**ECF No. 35**) is **GRANTED**.

_____
**SENIOR UNITED STATES DISTRICT JUDGE**